Carl **JENSEN** and Judy Jensen for themselves individually, and on behalf of their children, C.J., AMJ and ABJ, Plaintiffs,

v.

Muffet **REEVES**, in her official and individual capacity, The Alpine School District, Defendant Tom Rabb, in his official and individual capacity, Defendant Roy Pehrson, in his official and individual capacity, and Kent Pierce, in his official capacity, Defendants.

No. 98 CV 208B.

United States District Court,
D. Utah,
Central Division.

March 29, 1999.

Mathew Hilton, Springville, UT, for plaintiffs.

Renee Spooner, Salt Lake City, UT, for defendants.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### INTRODUCTION

This matter comes before the Court on defendants' Motion to Dismiss for failure to state a claim. Plaintiffs Carl and Judy Jensen, for themselves and their children C.J., A.M.J., and A.B.J., are suing defendants Muffet Reeves (the principal of C.J.'s and A.M.J.'s elementary school), the Alpine School District, and school officials Tom Rabb, Roy Pehrson, and Kent Pierce. Generally, plaintiffs' suit arises out of C.J.'s suspension from elementary school for several alleged incidents of misconduct. C.J.'s parents allege, inter alia, that theirs and their children's due process rights have been violated as a result of the suspension. On April 9, 1998, defendants moved for dismissal of all claims for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12b(6). Upon being fully briefed, the Court heard oral argument on defendants' motion to dismiss on July 8, 1998. Shortly thereafter plaintiffs filed a motion to amend their complaint. Subsequently, and before the Court made rulings on the pending motions, defendants filed a motion to dismiss the amended complaint. The briefing on defendants' motion to dismiss plaintiffs' amended complaint was completed in August, 1998.

The Court hereby grants plaintiffs' motion to amend their complaint.

Considering all relevant arguments made during oral argument and in the briefs, for the reasons set forth below the Court grants defendants' motion to dismiss plaintiffs' amended complaint.

## BACKGROUND

### I. Facts

C.J. attended Sharon Elementary School in Orem, Utah, beginning the first grade in 1996. During both his first and second-grade years, C.J. accumulated an extensive history of misconduct. In October, 1996, C.J. was twice given citizenship slips by Ms. Hyatt, his first-grade teacher, for "kicking other students" and "hitting others with a stick." On three separate occasions in December, 1996, C.J. was given citizenship slips by Principal Reeves for using "nasty language," disobeying his teacher, throwing snowballs, and pushing other children. In May, 1997, C.J. punched a girl in the nose, causing her to bleed, and was suspended for the last day of the school year. Early the following school year, a complaint for harassment was lodged against C.J. by a female student (L.P.).

Following the harassment complaint, Principal Reeves mailed to C.J.'s parents a copy of a letter she had sent to L.P.'s parents which outlined the action taken by the school in response to the complaints. The letter stated that pursuant to an investigation in accordance with district policy, C.J. would lose his lunch privileges and be required to spend his lunch periods in the principal's office during the first week of November. Upon receipt of the letter, Mr. Jensen went to the district offices and met with the Assistant Superintendent over Elementary Education. Mr. Jensen was given a copy of the district's disciplinary policy. Mr. Jensen expressed concern over not being contacted earlier regarding the harassment complaint or that C.J. had a problem of this sort. Principal Reeves apparently had tried to contact the Jensens earlier but had the wrong telephone number.

In November, 1997, C.J.'s second-grade teacher, Mrs. Russell, and Principal Reeves contacted the Jensens to report on C.J.'s continuing negative conduct in class and arrange for a meeting between the school and the Jensens to discuss how best to resolve C.J.'s ongoing discipline problems. During the meeting, C.J.'s teacher, Mrs. Russell, allegedly indicated she felt it was inappropriate for the Jensens to have directly contacted the district offices regarding the earlier harassment complaint. Additionally, the parties discussed C.J.'s behavioral history, hyperactivity, excessive side effects of prior medication, prior work with a psychologist, and ways to help the Jensens and the school address any inappropriate action by C.J.

Following the meeting, Principal Reeves had C.J. take home a packet of information which described Alpine School District's special education program pursuant to the Individual with Disabilities Education Act (IDEA). A school official followed up with Mr. Jensen and inquired if the Jensens were interested in making a request to determine C.J.'s eligibility for the program. The Jensens did not make such a request for special education services. The Jensens did, however, retain a psychologist of their own to evaluate C.J. School officials thereafter cooperated with C.J.'s psychologist by submitting evaluation forms regarding C.J.'s behavior. There is some indication that C.J.'s behavior showed improvement in December, 1997. In early January, 1998, C.J. began to misbehave again.

On January 7, 1998, C.J. refused to behave during the student of the month assembly and was required to sit next to Mrs. Russell for the remainder of the program. On January 20, 1998, the Jensens were sent a written memorandum from Principal Reeves indicating that C.J. had hit another student (this was the second hitting incident). Principal Reeves informed the Jensens that she had reviewed the content of the memo with C.J. and that if a third incident occurred, C.J. would be

suspended for ten days and a district hearing would be held to determine whether additional action, including expulsion from school, was necessary. Despite these efforts, however, on February 5, 1998, C.J. pushed another student. Principal Reeves informed the Jensens of the incident and scheduled a fact-finding hearing regarding C.J. to determine the appropriate course of action. Principal Reeves subsequently suspended C.J. for 1.5 days and referred the situation to the District Hearing Committee.

On February 5, 1998, Defendant Rabb of the Alpine School District and Mr. Jensen set February 12, 1998 at 1:00 p.m. as the time for a district panel hearing. The next day, however, Mr. Jensen allegedly called Mr. Rabb requesting to change the hearing to February 13 at 6:00 p.m. so that the hearing could take place at the office of C.J.'s psychologist. Mr. Rabb, however, was out of town and could not be reached. The Jensens believed the meeting was going to take place on February 13, 1998 and were planning on presenting "clinical and sub-clinical" evidence of C.J.'s Attention Deficit and Hyperactivity Disorder (ADHD). On February 12, 1998 at 1:00 p.m., as initially scheduled, the hearing was convened and the Jensens did not attend. Those in attendance were defendants Rabb, Pehrson, and Pierce. Following the hearing, Mr. Rabb called the Jensens and informed them that the meeting had taken place without them under approval of the Superintendent's representative Mr. Pehrson, and that the Jensens had five days to respond in writing or to schedule a date and time to have the hearing reconvened so that they could provide any information they felt necessary for the panel to hear. Following this phone call, Mr. Jensen called Superintendent Steven C. Baugh and lodged a complaint regarding the manner in which the hearing had been handled. On February 13, 1998, Mr. Pehrson and Mr. Jensen agreed that Mr. Jensen would contact Mr. Pehrson by February 27, 1998, to establish a time when they could meet with the panel. Two days prior to the end of this time period, on February 25, 1998, Mr. Jensen informed Mr. Pehrson that he had contacted a lawyer and wanted to meet with attorneys present.

In the meantime, on March 2, 1998, C.J. was involved in yet another confrontational incident on the school's playground, and was called to the principal's office. Principal Reeves questioned all students involved in the incident, including C.J. Each student was given an opportunity to give his or her version of the incident. Harassment complaints were thereafter filed against C.J. by several parents of students claiming to have been hit or touched in an offensive manner by C.J. The next day, March 3, 1998, Principal Reeves requested a meeting with the Jensens. Mr. Jensen refused, stating that he wanted attorneys present and that he had already told this to Mr. Pehrson. On March 4, 1998, Principal Reeves informed the Jensens that in accordance with district policy C.J. was suspended for ten days or until the meeting between counsel for the District and the Jensens, whichever occurred first.

The Jensens responded by filing this lawsuit, pursuant to 42 U.S.C. § 1983, for various violations of constitutional or statutory rights of both C.J. and the Jensens themselves. Specifically, plaintiffs' amended complaint contains seven claims for relief. Plaintiffs claim (1) they were denied procedural due process when C.J. was suspended from school for ten days; (2) that C.J., by virtue of his ADHD, qualifies as a handicapped person and as such defendants' actions violated § 504 of the Rehabilitation Act which ensures certain protections to handicapped persons; (3) that C.J. was denied equal protection of the law; (4) that the Jensens, as C.J.'s parents, have been denied their right to direct the care and upbringing of their children; (5) that defendants infringed on the reputational interest of C.J. among his peers; (6) that defendants violated C.J.'s and the Jensens' privacy rights by violating § 1232(g) of the Family Educational Rights and Privacy Act ("FERPA"); and

(7) that the Jensens' First Amendment parental right to petition for redress of grievances was violated.

## II. Standard of Review

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. In ruling on defendants' motion to dismiss, the court assumes the truth of all well-pleaded facts in plaintiff's complaint and views them in the light most favorable to plaintiff. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Roman v. Cessna Aircraft Co.,* 55 F.3d 542, 543 (10th Cir.1995). The court views all reasonable inferences in favor of the plaintiff, and the pleadings are construed liberally. *Id.* The court may dismiss the complaint for failure to state a claim upon which relief can be granted only if it appears to a certainty that plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cessna Aircraft,* 55 F.3d at 543.

In reviewing the sufficiency of a complaint, the issue is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support its claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Legal conclusions, deductions, and opinions couched as facts are, however, not presumed to be true. *See Mitchell v. King,* 537 F.2d 385 (10th Cir.1976). The likelihood that the plaintiff may or may not prevail at trial is immaterial at the time of decision on a motion to dismiss. *Gadd By and Through Gadd v. U.S.,* 971 F.Supp. 502, 505 (D.Utah 1997). If the court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is denied if it is clear that amendment would be futile and the complaint's deficiencies are incurable. *See Grossman v. Novell, Inc.,* 120 F.3d 1112, 1126 (10th Cir.1997) (holding that if the denial to amend rests on articulated reasons such as failure to cure deficiencies or futility of amendment the district court's decision shall stand).

## Analysis

The United States Supreme Court has held that the "first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'" and that the subsequent inquiry requires that such deprivation occur under color of state law. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *see Gunkel v. City of Emporia,* 835 F.2d 1302, 1303 (10th Cir.1987). In the present case, from the facts construed in the light most favorable to the plaintiffs, it appears to this Court that plaintiffs have not adequately stated claims in which a deprivation of a right secured by the Constitution or other laws has occurred. The defendants' motion therefore is well taken and will be granted.

## I. Due Process

Plaintiffs' due process claim arises out of the events surrounding C.J.'s ten day suspension and the alleged failure on the part of the defendants to comply with the procedural due process requirements of the Fourteenth Amendment. Plaintiffs make two basic assertions in support of their due process claim. First, plaintiffs argue that the manner in which Principal Reeves investigated and handled the events leading up to C.J.'s suspension was in violation of C.J.'s due process rights. Second, plaintiffs allege that when the school convened a hearing regarding the expulsion or suspension of C.J., they did so in violation of district policies.

The Supreme Court, in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), provides guidance on this issue. In *Lopez,* a class action of students who had been facing suspensions of ten days or less argued that the Ohio statute permitting such suspensions without requiring a hearing was unconstitutional. The Supreme Court began by finding that a student's legitimate entitlement to a public

education is "a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id.* at 574, 95 S.Ct. 729. Consequently, "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). To formulate "what process is due" the *Lopez* court considered many factors. First, the Court was mindful that "[b]y and large, public education in our Nation is committed to the control of state and local authorities" but also, that there are certain bench marks which must guide the Court's determination. *Lopez,* 419 U.S. at 574, 95 S.Ct. 729. "There can be no doubt" the Court noted, that at a minimum the "cryptic and abstract words of the Due Process Clause" require that a deprivation of life, liberty or property be preceded by notice and an opportunity to be heard. *Id.* at 578–79, 95 S.Ct. 729 (citations omitted). Additionally, the Court emphasized that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved. The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id.* at 579, 95 S.Ct. 729. On the other hand, the educational interests involved recognize that

> [s]ome modicum of discipline and order is essential if the educational function is to be performed. *Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.* Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device. The prospect of imposing elaborate hearing requirements in every suspension case is viewed with great concern, and many school authorities may well prefer the untrammeled power to act unilaterally, unhampered by rules about notice and hearing. *But it would be a strange disciplinary system in an edu-*

*cational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done.* "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.... Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."

*Id.* at 580, 95 S.Ct. 729 (citing *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951)) (emphasis added). With these factors in mind, the Court announced that "due process requires, in connection with a suspension of 10 days or less, that *the student be given oral or written notice of the charges against him* and, if he denies them, an explanation of the evidence the authorities have *and an opportunity to present his side of the story." Id.* at 581, 95 S.Ct. 729 (emphasis added). This new standard, the Court held, embodies "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id.* Providing further guidance, the Court indicated that "[t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.* at 582, 95 S.Ct. 729. Particularly applicable to the present case, the Court in *Lopez* also held that "there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." *Id.* at 582–83, 95 S.Ct. 729. The Court emphasized that it "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings in con-

nection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583, 95 S.Ct. 729.

In light of *Lopez,* the Court is satisfied that in the present case plaintiff was afforded every procedural due process protection owed to him. Indeed, as *Lopez* indicated, given the pattern of misbehavior and continual threat being posed by C.J. to other students, Principal Reeves may have been justified in immediately suspending C.J. without the requisite notice of the charges and opportunity to explain. As outlined above, the Court in *Lopez* held that even the minimal due process requirements of "notice of the charges and opportunity to explain" for a ten-day or less suspension may be temporarily waived and the student immediately suspended where the student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process." *Id.* at 582, 95 S.Ct. 729. There is ample evidence to support the argument that C.J. posed such a threat to other students and to the academic process.

■ Notwithstanding such, the rudimentary precautions against unfair or mistaken findings of misconduct were adhered to by defendants. The incident in question occurred on March 2, 1998 and Principal Reeves informed C.J. on March 2, 3, and 4, 1998, of the complaints and charges being made against him. Principal Reeves allowed C.J. and other students an opportunity to explain their side of the story.[1] Furthermore, the Jensens were contacted on March 3, 1998 and invited to meet with the principal regarding the incident. After all of this, Principal Reeves informed the Jensens that C.J. was suspended for a period of ten days or until a meeting with the parents and their attorneys occurred, whichever occurred first.

■ Regarding the hearing that was convened, plaintiffs complain that the hearing was held without them and that they were not afforded adequate notice of the allegations against their son. The record indicates, however, that the Jensens were given opportunity to attend the hearing. Additionally, the Administrative Panel that conducted the hearing sent the Jensens a tape of the hearing and informed them that they could respond in writing or set another time to reconvene the panel. Mr. Jensen responded that he would contact defendants with a time and date for the panel to reconvene.[2] The panel has not reconvened because Mr. Jensen has yet to set a date and time— choosing instead to involve attorneys and instigate this lawsuit.[3]

1. Plaintiffs argue that because C.J. was questioned in front of his peers, procedural due process was not met. The Court is unaware of any such distinction made by the Supreme Court in *Lopez.* The underlying rationale is fairness to the alleged misbehaving student by way of an opportunity to explain his version of the events. There is nothing in the record that indicates that Principal Reeves did anything other than attempt to ensure fair resolution to many instances of misbehavior on the part of plaintiff C.J. There is nothing intrinsically unfair in questioning several students at one time and in one place. In fact, there is legitimate reason to believe that the ability to ascertain truth about what occurred during the incident is increased when all students involved are present.

2. It is of some significance to point out that no final decision has ever been made by the Administrative Panel (defendants Rabb, Pierce, and Pehrson), this fact alone is enough to dismiss these defendants from the action for plaintiff's failure to exhaust administrative remedies. Indeed, the suspension was done by Principal Reeves in accordance with district policy 6.1 regarding Expulsions which states that "[p]rincipals/administrative designees have authority to suspend pupils up to 10 school days pending the outcome of investigation and recommendation to expel." Furthermore, as is discussed below, qualified immunity especially applies to protect the members of the Administrative Panel.

3. It should be noted here that C.J.'s parents appear to also be claiming a lack of procedural due process owed to them as a result of C.J.'s ten-day suspension. This cannot be embraced by the Court. The procedural due process that is owed is owed to the student facing suspension. Indeed, in their attempts to assert their own due process rights, the

Plaintiffs' First Amended Complaint adds to their Due Process claim arguments that because C.J. is a § 504 disabled student the suspension and panel hearing that was convened especially violated plaintiffs' rights. The problem with plaintiffs' argument is more fully explained below.

## II. Right of Parents to Direct the Care and Upbringing of Their Children

In a long line of cases, the Supreme Court has held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *id; Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, *Casey v. Planned Parenthood*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Applicable to this case, the "liberty" of parents to control the education of their children that was vindicated in *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070

(1925), has been described as a "right, coupled with the high duty, to recognize and prepare [the child] for additional obligations." Pierce, 268 U.S. at 535, 45 S.Ct. 571. The linkage between parental duty and parental right was stressed again in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), where the Court declared it an essential principle "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166, 64 S.Ct. 438.

▮ Except when a religious element has been raised, the Supreme Court has declared that the parents' liberty interest in directing their children's schooling is a lesser right and the test is whether the challenged state action is rationally related to a legitimate state purpose. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Relevant to this case, the Supreme Court has held that a school district has a legitimate purpose in disciplining students who violate school rules. *See New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In the present case, this Court finds that the actions of defendants, including the issuance of citizenship slips, in-school suspensions, and the ten-day out-of-school suspension were all rationally related to the legitimate interest in disciplining an unruly student. Plaintiffs, in their original complaint, argue that their liberty interest

---

Jensens seek to do the very thing the Supreme Court in *Lopez* indicated it desired to stop short of—namely a requirement "that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Goss v. Lopez*, 419 U.S. at 583, 95 S.Ct. 729. The Court specifically wanted to avoid

truncated trial-type procedures [which] might well overwhelm administrative facilities ... and, by diverting resources, cost

more than it would save in educational effectiveness. Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

*Id.* Consequently, this Court cannot in good conscience stretch the procedural safeguards of the Due Process Clause past the point of all practicality and risk upsetting the balance of interests as outlined in *Lopez* which are involved in the public education of a state's elementary school-aged children.

was violated because the public school imposed treatment or conditions on C.J. which served only to undermine the therapeutic treatment C.J. was receiving from medical professionals. Based on the clear indications in the record, the defendants were not only mindful of C.J.'s therapeutic treatment, but attempted to coordinate efforts with both the Jensens and C.J.'s therapist in an effort to best serve C.J. The disciplinary measures taken against C.J., which are at issue here, were done after multiple incidents of punching, kicking, pushing, kicking, harassing and general disregard for others and the authority of teachers and the principal. Furthermore, at all times the Jensens were informed and invited to give suggestions for the discipline of their son. It is the opinion of this Court that all of the actions taken by defendants, including the ten-day suspension, were rationally related to the legitimate purpose of maintaining an orderly student body and educational environment. From the undisputed record, no reasonable fact-finder could find otherwise.

As noted above, when a claim for violation of the parental right to control the upbringing and education of their child is coupled with a free exercise of religion claim, the rational basis test cannot be used. Concerning this type of "hybrid" claim, the Supreme Court has stated that "when the interests of parenthood are combined with a free exercise claim . . . more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement. . . ." *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citations omitted). The leading case concerning this issue is *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the Court invalidated Wisconsin's mandatory school-attendance law as applied to Amish parents who refused on religious grounds to send their children to school. In *Yoder,* the

Court emphasized that a State's educational interest

> is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce* "prepare [them] for additional obligations."

*Id.* at 214, 92 S.Ct. 1526 (citations omitted). In order for plaintiffs to succeed in such a claim, they would have to be able to show that defendants' actions unreasonably interfere with the practice of a *legitimate* religious belief. *See id.* at 214–15, 92 S.Ct. 1526.

■ In the mind of this Court, plaintiffs, in their amended complaint fail to put into issue a legitimate religious belief, let alone one in which defendants unreasonably interfered. In *Yoder,* the Court held that "[a]lthough a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at 215–16, 92 S.Ct. 1526 (citations omitted). Plaintiffs' religious claim is nothing more than an attempt to invoke, after-the-fact, a standard upon defendants' actions which go contrary to established, religious-neutral guidelines for disciplining misbehaving elementary school children. Plaintiffs have not identified a specific, legitimate religious belief that was infringed upon by the actions of defendants surrounding C.J.'s suspension. Plaintiffs, in their amended complaint, have merely sought to add a religious element to the Jensens' "right to control the upbringing and education" claim in order to avoid dismissal, not out of any legitimate religious belief that defendants are infringing upon. Plaintiffs allege that the discipline undertaken by the

defendants consisted of an "imposition of a framework that was counter to that recommended by the psychologist and them as parents" and was "counter-productive and interfered with their ability to live what they beieve [sic] is the best way to fulfill their moral duty to God regarding C.J. by providing for his social and moral development." (Pl.'s First Amend.Compl. ¶ 69). This amendment does not require this Court to apply a heightened scrutiny standard against the actions of defendants in suspending C.J. for ten days. Plaintiffs have not, according to Supreme Court precedent, turned their claim into the proper "hybrid" situation requiring such heightened scrutiny. It is, as the Court in *Yoder* noted, merely an attempt by the Jensens to impose their own standard on "matters of conduct in which society as a whole has important interests." *See Yoder*, 406 U.S. at 215–16, 92 S.Ct. 1526.

However, even if this Court were to find that plaintiffs have properly added an appropriate religious element to their "right to control the upbringing and education" of C.J. claim, and thus created the "hybrid" claim explained above, defendants' actions still could not be found to violate such rights. The Court in *Yoder* cautioned that "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." *Yoder*, 406 U.S. at 215, 92 S.Ct. 1526. The state action in question here is based on a purely secular consideration that does not single out a particular religion or ability of particular persons to exercise legitimate religious beliefs. The school's disciplinary policies and procedures are content neutral and were implemented in a reasonable manner. Consequently, even if plaintiffs sufficiently alleged a "hybrid" claim, deserving of heightened scrutiny, defendants' actions did not unreasonably interfere with plaintiffs' exercise of their religious beliefs. Such amendment still does not alter the fact that a state has an important interest in disciplining students such as C.J. who punch, kick, push, use nasty language, and otherwise harass other students. The facts indicate that the parents and the psychologist were indeed consulted in the disciplining of C.J. and that their interests were given deference. Accordingly, plaintiffs' claim must be dismissed.

### III. Injury to Reputation

The Supreme Court has held that something more than mere defamation must be involved in order to state a claim under § 1983. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The Court also noted that such a claim can be redressed by state tort law and that such an injury to reputation, even if inflicted by a state officer, does not result in a deprivation of any liberty or property interest recognized by state law. *Id.* at 712, 96 S.Ct. 1155.

In plaintiffs' proposed First Amended Complaint they claim that the suspension in question violates C.J.'s rights in that the presence of these suspensions in C.J.'s record serves to damage his future personal reputation and is actionable under *Goss v. Lopez*, 419 U.S. at 574–75, 95 S.Ct. 729. However, such a claim is only actionable where a school fails to adhere to the "minimum procedures required by [the Due Process Clause]." *Id.* As noted above, the Court finds that defendants sufficiently met the minimum requirements as outlined in *Lopez*, namely that in a situation involving a ten-day or less suspension, the student be given notice of allegations against him and an opportunity to explain his version of the incident. This standard was met in this case and the fact that other students were aware of this incident and others, or that C.J.'s record contains such information cannot serve as the basis for plaintiffs' action for injury to reputation.

### IV. Search and Seizure, Privacy, and FERPA

Plaintiffs do not refute that in the context of public schools, the Supreme Court has established that the "privacy

interests of school children" must be balanced against the "substantial need of teachers and administrators for freedom to maintain order in schools" and that this standard replaces the probable cause requirement. *New Jersey v. T.L.O.*, 469 U.S. at 340–41, 105 S.Ct. 733. The Tenth Circuit has applied this standard to seizure cases as well. *See Edwards v. Rees*, 883 F.2d 882 (10th Cir.1989) (determining that a vice-principal's 20 minute detention of a student for questioning about accusations of a bomb threat was not a violation of the Fourth Amendment). Plaintiffs assert, however, that defendants violated C.J.'s and his parents' rights "to have him and his records ... secure and not having information taken from him in an unreasonable manner." (Pl.'s Amended. Compl. ¶ 80). Plaintiffs allege that defendants infringed upon this right when "C.J. was called in by Defendant Reeves to review the March 2, 1998 playground incident" and was pressured into explaining his conduct in front of six or more other classmates. (Pl.'s Amend. Compl. ¶ 81).

The practical effect of plaintiffs' search and seizure claim, if successful, would undermine both the Fourteenth Amendment standard and the public policy interest in fairness as articulated in *Lopez*. Due process requires that Principal Reeves notify and provide C.J. an opportunity for explanation, but, plaintiffs argue that the Fourth Amendment does not allow Principal Reeves to question C.J., especially when other students are present. Having determined that Principal Reeves adequately handled the situation pursuant to the holding of *Lopez*, the Court cannot find that such conduct violated C.J.'s or his parents' right of privacy or right against unlawful search and seizure. Again, it appears to this Court that Principal Reeves' questioning of C.J. and other students was reasonable and in fact necessary under the circumstances. Plaintiffs provide no precedent that would suggest that Principal Reeves' actions were not in conformance with both the Fourteenth and Fourth Amendments.

In addition to their search and seizure claim, plaintiffs, in their proposed First Amended Complaint, have added a Family Educational Rights and Privacy Act (FERPA) claim based on the allegation that Principal Reeves, in responding to harassment complaints lodged against C.J., disclosed to the parents of other students, without the consent of the Jensens, information regarding C.J. that is protected under FERPA (20 U.S.C. § 1232(g)). The Court is not persuaded by this argument. Principal Reeves was merely explaining, to the very parents that were complaining of sexual harassment, the actions taken in response to their complaints. Section 1232(g) of the FERPA deals only with the release of educational records without the student's consent. Here, Principal Reeves did not release any records to other parents. Furthermore, the language of the statute appears to limit its prohibition to those situations where an educational agency "has a policy or practice of permitting the release of education records." *See* § 1232(g)(b)(1) and (2). The Act does not contemplate the dissemination of information to parents complaining of a particular student. FERPA was adopted to address systematic, not individual, violations of students' privacy by unauthorized releases of sensitive information in their educational records. *See Gundlach v. Reinstein*, 924 F.Supp. 684 (D.Penn.1996). At least one court has held that the release of personally identifiable information to third parties without parental consent is not actionable unless it was done under an official policy or practice of the school district. *See Maynard v. Greater Hoyt Sch. Dist.*, 876 F.Supp. 1104 (D.S.D.1995). In addition, at least one court has noted that there is reason to believe that Congress did not even intend for § 1983 to provide a remedy for an individual release of student records allegedly covered by FERPA. *See Gundlach*, 924 F.Supp. at 692.

Accordingly, plaintiffs' search and seizure, privacy, and FERPA claims must be dismissed.

## V. Right to Petition for Redress of Grievances

■ Plaintiffs base their right to petition for a redress of grievances claim on the allegation that the Jensens were criticized for speaking directly to district officials rather than local school officials. The purpose behind this First Amendment right is to allow people to communicate their grievances through direct petitions to the legislature and government officials. *See McDonald v. Smith,* 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Even assuming that Mrs. Russell's comments could be construed as criticizing the Jensens for speaking first with the Superintendent before coming to herself or Principal Reeves, this is not remotely close to an infringement on the Jensens' right to petition for a redress of grievances. At the time of the alleged criticism, the Jensens had exercised, and would continue to exercise, the very right they are now claiming was infringed upon, namely to petition state officials. As such, the Court finds that plaintiffs' allegations fall short of stating a claim for violation to plaintiffs' right to petition for a redress of grievances and must be dismissed.

## VI. Section 504 of the Rehabilitation Act and the IDEA

■ The Rehabilitation Act serves to protect disabled individuals who are in federally funded programs and activities, from discrimination. 29 U.S.C. § 794(a). Section 504 of the Act requires that the state evaluate and appropriately place students who, because of disability, need or are believed to need special attention or related services. 34 C.F.R. § 104.35. Plaintiffs argue that C.J. "likely had ADHD," an attention deficit disorder. However, defendants are correct in their assertion that complying with the procedures of the Individuals with Disabilities Education Act (IDEA) is a means of complying with the Rehabilitation Act. *See* 34 C.F.R. §§ 104.33(b)(2), 104.35(d), 104.36 (1996) (stating that "[c]ompliance with the procedural safeguards of [IDEA] is one means of meeting this requirement.").

The Tenth Circuit has recently held that the "regulations promulgated under [the Rehabilitation Act] generally conform to the standards established by IDEA." *Urban v. Jefferson County Sch. Dist. R–1,* 89 F.3d 720, 728 (10th Cir.1996) (also stating that plaintiffs were required to exhaust administrative remedies before filing a court claim under IDEA). Plaintiffs do not dispute that defendants sent them all of the necessary documents, including permission slips, for C.J. to be considered for special education placement. Defendants provided plaintiffs with an opportunity to have C.J. evaluated to determine if he indeed qualified for the special education program. The Jensens never requested or consented to the placement of C.J. in a special education program.

Additionally, there is some question as to whether either of the Acts apply in this case. Before the Acts can apply, parental consent must have been obtained before conducting a preplacement evaluation and initial placement of a child with disability in a program providing special education and related services. "Consent" has been taken to mean that the parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought. *See* 34 C.F.R. §§ 300.500, 300.504. While plaintiffs wish to convince this Court that their private evaluation of C.J. illustrated the consent for a "preplacement evaluation," the fact remains that the Jensens never indicated in writing to the defendants or requested in any other manner that C.J. be placed in a special education program. Consequently, the Court must find that C.J.'s handicapped status was never established such that the defendants would be required to have treated C.J. in any manner differently from other students.

## VII. Equal Protection

■ Plaintiffs' Equal Protection claim is based on a belief that other students similarly situated received different treatment from the defendants than C.J. re-

ceived. This claim, however, is premised on an assumption that C.J. is considered disabled under § 504 but was treated as though he were not disabled. The most significant problem for plaintiffs here, is that they fail, in both their Complaint and First Amended Complaint, to set forth any facts that would indicate that C.J. was treated in a manner differently than other similarly situated students. There are no allegations of other students who were similarly situated receiving more favorable treatment by defendants. Indeed, the record seems to suggest that if anything, C.J. was given more leniency and forbearance than many other students. Additionally, plaintiffs' claim for equal protection must fail for lack of a showing that C.J. should have been recognized by defendants as disabled and thus entitled to different treatment than those students without disabilities.

### VIII. Qualified Immunity and the Governmental Immunity Act

██ Although mostly academic at this point, it should be acknowledged that plaintiffs' claims against defendants Reeves, Rabb, Pehrson, and Pierce must be dismissed under principles of qualified immunity. The Supreme Court has held that government officials are entitled to some immunity from suits for damages. *See Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1981). The Court has recognized that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981) (quoting *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). The qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It "is an immunity from suit rather than a mere

defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In order to overcome this immunity from suit, plaintiff is held to a "heightened standard of pleading" and must include all factual allegations necessary to sustain the conclusion that defendants violated clearly established law. *See Sawyer v. County of Creek,* 908 F.2d 663, 667 (10th Cir.1990). This burden has not been met by plaintiffs. Consequently, the Court finds that the above named defendants are entitled to qualified immunity and plaintiffs' claims are dismissed.

██ Likewise, plaintiffs' claims under the Utah State Constitution must be dismissed for failure to meet the requirements of the Utah Governmental Immunity Act. Utah Code Ann. §§ 63–30–1 *et seq.* Under the Act, plaintiffs must give written Notice of Claim to defendants before any action against the State or its employees can be maintained. *See* Utah Code Ann. § 63–30–11(2); *Madsen v. Borthick,* 769 P.2d 245, 249–50 (Utah 1988) (holding that notice is required regardless of whether the suit is against the governmental entity or its employees and is a jurisdictional requirement to filing suit). Plaintiffs failed to give such Notice of Claim and as such, their state constitutional claims must be dismissed.

### CONCLUSION

Having reviewed both written and oral arguments submitted in support of and in opposition to dismissal of plaintiffs' First Amended Complaint and for the reasons set forth above, IT IS HEREBY ORDERED that defendants' Motion to Dismiss Plaintiffs' First Amended Complaint is GRANTED.