**Michael MERRIKEN et al.**

v.

**Wilmer D. CRESSMAN et al.**

**Civ. A. No. 72–2057.**

United States District Court,
E. D. Pennsylvania.

Sept. 28, 1973.

**914**

Judah I. Labovitz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia Pa., for plaintiff.

Horace Davenport, Gerber, Davenport & Wilenzik, Norristown, Pa., for defendant.

## OPINION and ORDER

JOHN MORGAN DAVIS, District Judge.

### I. FINDINGS OF FACT

1. Plaintiff, Michael Merriken, is an eighth grade student at Stewart Junior High School, Marshall and Forrest Avenues, Norristown, Pa. Plaintiff, Sylvia Merriken, is the mother of Michael Merriken, is a resident of Montgomery County, and pays real estate and other taxes to the county. (N.T. 12/1/72 at 13; N.T. 12/18/72 at 130)

2. Defendants are the Montgomery County Commissioners, the members of the Norristown Area School Board, the Superintendent of Schools of the Norristown Area School Board, and the Principal of Stewart Junior High School. (N.T. 12/1/72 at 13–14)

3. Defendants, acting in concert with each other and with Fred Streit Associates, intend to introduce a program entitled Critical Period of Intervention (CPI) into the Norristown Area School District to be administered to eighth grade students including Plaintiff, Michael Merriken. (N.T. 12/1/72 at 14; N.T. 12/18/72 at 132; N.T. 5/18/73 at 49–50)

4. Defendants intend to expend public tax monies to implement the CPI Program. (N.T. 12/1/72 at 16)

5. The stated purpose of the CPI Program is as a drug prevention approach as contrasted with drug rehabilitation efforts. It is designed to aid the local school district in identifying potential abusers, prepare the necessary interventions, identify resources to train and aid the district personnel to remediate the problems and, finally, to evaluate the results. (N.T. 12/1/72 at 14; Plffs' Exh. 7)

6. When suit was first instituted, Defendants did not intend to obtain the affirmative consent of parents to the participation of their children in the CPI Program. Rather, Defendants proposed a "book of the month club" approach in which a parent's silence would be construed as acquiescence. (Plffs' Exh. 3) It was only after suit was started that Defendants offered to change that format so that affirmative written parental consent to participation in the CPI Program would be required. (Plffs' Exh. 4)

7. However, the revised letter to parents makes no provision whatsoever for allowing parents to see the test instrument itself. (Plffs' Exh. 4; N.T. 5/18/73 at 128–129)

8. As originally proposed, the CPI Program contained no provision for student consent. After commencement of

litigation, Defendants did modify the test instrument to allow students to return a blank questionnaire. However, no affirmative written consent from the students is contemplated nor is any data made available to students in advance to assist them in their decision. (Defts' Exh. 11; N.T. 5/18/73 at 84; 121–122; N.T. 12/18/72 at 132)

9. In addition to a letter, Defendants propose to send to parents a question and answer sheet explaining the CPI Program. (Plffs' Exh. 5) By the admission of its author, Mr. Streit, that document is a "selling device", "an attempt to convince the parent to allow the child to participate". The whole purpose in composing that document "was to convince parents that they ought to allow their children to participate". (N.T. 5/18/73 at 124) Mr. Streit acknowledged that "there is nothing in this document . . . that is critical of or negative about the CPI Program". (N.T. 5/18/73 at 124)

10. Two child psychiatrists testified without contradiction as to several negative, and indeed dangerous aspects of the CPI Program, none of which are mentioned or referred to in any of the materials to be made available to parents. These dangers include the risk that the CPI Program will operate as a self fulfulling prophecy in which a child labelled as a potential drug abuser will by virtue of the label decide to be that which people already think he or she is anyway. (N.T. 12/18/72 at 28–29, 90–92) In fact, the CPI Program manual itself, not available to parents, acknowledges this risk. (Plffs' Exh. 7) Another danger mentioned is that of scapegoating in which a child might be marked out by his peers for unpleasant treatment either because of refusal to take the CPI test or because of the results of the test. (N.T. 12/18/72 at 31–32, 90–91) That this is not a mere hypothetical risk was illustrated by an incident involving Plaintiff, Michael Merriken, in which fellow students accused him of being a drug user because his mother does not want him to participate in the CPI Program. (N.T. 12/18/72 at 132–35) Drs. Gordon and Hanford also described the severe loyalty conflict that might result by asking children the types of personal questions about their relationship with parents and siblings which are included in the CPI questionnaire. (Plffs' Exh. 1; N.T. 12/18/72 at 30–31, 86) A final example has to do with the qualifications of the personnel who will administer the so-called interventions once the results of the CPI questionnaire have been evaluated. As both psychiatrists pointed out, the types of psychotherapy that are suggested as interventions in the CPI Program are quite sophisticated and require the skills of trained psychotherapists, psychiatrists, psychologists, etc. who have undergone many years of training. However, the CPI Program contemplates that these sophisticated psychotherapy techniques will be administered by school personnel, including teachers without any particular qualifications who have undergone only a short crash course. (N.T. 12/18/72 at 36–38, 92–96; Plffs' Exh. 7; N.T. 5/18/73 at 171)

11. According to the Program, CPI is a "drug prevention approach as contrasted with drug rehabilitation efforts . . . It is designed to aid the local school district in identifying potential abusers, prepare the necessary interventions, identify resources to train and aid the district personnel to remediate the problems and, finally, to evaluate the results". (Plffs' Exh. 7) However, the Program nowhere defines the term "potential [drug] abuser". All that the Program does state is that it will identify patterns similar to marijuana, LSD, barbiturate or amphetamine user. There is no reference to such drugs as cigarettes, alcohol, opium, heroin or cocaine. Moreover, there is no statement as to what constitutes abuse. The study on which CPI is based, however, does contain "an arbitrary set of decisions . . . to define the degrees of use, known or experimental, moderate or heavy". (Plffs' Exhs. 6 & 7; N.T. 5/18/73 at 147)

12. Identification of a potential drug abuser, emotionally handicapped student,

or student with deviant behavior or student with specific problems is accomplished by requiring students such as Plaintiff and also their teachers to complete test questionnaires. (Plffs' Exhs. 1 and 2) The questionnaires ask such personal and private questions as the family religion, the race or skin color of the student (Defendants have since stipulated to dropping this question), the family composition, including the reason for the absence of one or both parents, and whether one or both parents "hugged and kissed me good night when I was small", "tell me how much they love me", "enjoyed talking about current events with me", and "make me feel unloved". In addition both students and teachers are asked to identify other students in the class who make unusual or odd remarks, get into fights or quarrels with other students, make unusual or inappropriate responses during normal school activities, or have to be coaxed or forced to work with other pupils. Students are at no time given any guidance as to what should be considered an odd or unusual remark or what is to be considered an inappropriate response. For example, there is no warning that political differences or unusual and imaginative insights should not be looked upon as odd remarks or inappropriate responses. (N.T. 5/18/73 at 120–121)

13. Although the CPI Program constantly refers to confidentiality, no specifics are given in the Program itself as to how confidentiality is to be maintained after evaluation. Mr. Streit did testify on this subject but that testimony is far different from what appears in the printed CPI materials. The Program, by its own terms, contemplates the development of a "massive data bank" and also dissemination of data relating to specific students to various school personnel, including superintendents, principals, guidance counsellors, athletic coaches, social workers, PTA officers, and school board members. (Plffs' Exh. 6) In fact, at a meeting of the Norristown School Board on Monday, October 23, 1972, parents were advised that teams

of faculty members had already been selected to receive data back from the CPI Program in order to implement the intervention stage of the Program in the various schools in Norristown. (N.T. 5/18/73 at 170–171)

14. Even if those who are to be working with the CPI Program were to try and be as confidential as possible, in accordance with Mr. Streit's testimony, there is absolutely no assurance that the materials which have been gathered would be free from access by outside authorities in the community who have subpoena power. Thus, there is no assurance that should an enterprising district attorney convene a special grand jury to investigate the drug problem in Montgomery County, the records of the CPI Program would remain inviolate from subpoenas and that he could not determine the identity of children who have been labeled by the CPI Program as potential drug abusers. (N.T. 5/18/73 at 172–173)

15. The second step of the CPI Program is "intervention" or "remediation". The stated purpose of this phase is "to change the cognitive and affective domains of potential drug abusers and other forms of deviant behavior". (N.T. 5/18/73 at 164–166) Intervention may take several forms, some of which are compulsory for the student and which seriously limit and infringe upon individual liberty. For example, one form of intervention, Guided Group Interaction (GGI) is specifically described in the CPI Program as an "involuntary assignment". GGI operates as follows:

a. "The peer group acts as a leveller or equalizer insuring that its members do not stray too far from its ranks".

b. The objective is "specific alteration in acting out or deviant behavior", both undefined terms.

c. "Deviancy is painstakingly defined and discouraged by the group itself. It can include not only socially proscribed behavior but any action which violates the group's specific normative system."

d. Members are compelled to "explain . . . why they have been assigned to the program . . . "

e. The group may impose sanctions on members, including "work detail, withdrawal of past privilege, recommendation to a special unit for intensive training, or the assignment of more onerous tasks". (Plffs' Exh. 6)

16. Intervention is also another major threat to the confidentiality of the CPI Program. For example, one form of intervention is Referral Intervention. Under this program, "responsible school personnel make referral interventions when remediation needed by a particular student far exceeds available school resources. This referral intervention utilizes community resources such as clinics, hospitals, rehabilitation centers, etc. to help the seriously disturbed or serious drug-user student." Another form of intervention is Adult Role Model in which "teachers [are] . . . asked to select two children from the list of identified emotionally handicapped children. They would be given background information on each child . . . "

17. The CPI Program results will not be made available to parents unless they affirmatively request them. (N.T. 5/18/73 at 170)

## II. DISCUSSION

The CPI Program as presented above is considered by its advocates, the Defendants, as a voluntary program in which affirmative parental consent is now given before participation by the student; and a student may return a blank questionnaire when the test is administered without apparent recrimination. It is contended that the Program is constitutional and is within discretionary power of the School Board.

The Plaintiffs assert that the Program is not voluntary because individuals' constitutional rights are waived without knowing, intelligent and aware consent. See Brady v. U. S., 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1969). Before the Court reaches the question of the voluntariness of this Program, we will examine the alleged violations of the Constitution and state why individual constitutional rights are involved in this litigation.

The Plaintiffs claim that the CPI Program will interfere with and impede the Plaintiffs' rights of freedom of religion, freedom of speech, freedom of assembly, privilege against self-incrimination and right to privacy guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States.

The main thrust of the Plaintiffs' argument that the CPI Program is an involuntary invasion of constitutionally protected rights, is the violation of the right to privacy. They base their argument mainly on Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), in which the Supreme Court ruled that inherent in the first nine Amendments to the Constitution is a right to privacy which is binding on the States as well. In a more recent case, the Supreme Court re-emphasized its position on the right of privacy in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973), and restated some of the general factual situations to which this right would apply. The Court said in *Wade, supra,* at 152–153, 93 S.Ct. at 726:

"The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251 [11 S. Ct. 1000, 35 L.Ed. 734] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, Stanley v. Georgia, 394 U.S. 557, 564 [89 S.Ct. 1243, 22 L.Ed.2d 542] (1969); in the Fourth and Fifth Amendments, Terry v. Ohio, 392 U.S. 1, 8–9 [88 S.Ct. 1868, 20 L. Ed.2d 889] (1968), Katz v. United

States, 389 U.S. 347, 350 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967), Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746] (1886), see Olmstead v. United States, 277 U.S. 438, 478 [48 S.Ct. 212, 72 L.Ed. 1017] (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, Griswold v. Connecticut, 381 U.S., at 484–485 [85 S.Ct. 1678]; in the Ninth Amendment, id., at 486 [85 S. Ct. 1678] (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see Meyer v. Nebraska, 262 U.S. 390, 399 [43 S.Ct. 625, 67 L. Ed. 1042] (1923). These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325 [58 S.Ct. 149, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, Loving v. Virginia, 388 U.S. 1, 12 [87 S.Ct. 1817, 18 L.Ed.2d 1010] (1967); procreation, Skinner v. Oklahoma, 316 U.S. 535, 541–542 [62 S.Ct. 1110, 86 L.Ed. 1655] (1942); contraception, Eisenstadt v. Baird, 405 U.S. [438] at 453–454, id., at 460, 463, 465 [92 S.Ct. 1029, 31 L.Ed.2d 349] (White, J., concurring in result); *family relationships*, Prince v. Massachusetts, 321 U.S. 158, 166 [64 S.Ct. 438, 88 L.Ed. 645] (1944) and *child rearing* and education, Pierce v. Society of Sisters, 268 U.S. 510, 535 [45 S.Ct. 571, 69 L. Ed. 1070] (1925), Meyer v. Nebraska, *supra*." (Emphasis added)

This Court will look closely at the factual situation as it relates to family relationships and child rearing. The CPI Program questionnaire asks whether the student's family is "very close, somewhat close, not too close, or not close at all." (Plffs' Exh. 1—Question 7) In addition, the student is asked to answer questions of such intimate things of his parents as to whether they "hugged and kissed him good-night when he was small" (Question 53); whether they told him how "much they loved him or her" (Question 54); whether the parents "seemed to know what the student's needs or wants are" (Question 116); and whether the student "feels that he is loved by his parents" (Question 112).

The above questions are samples which represent the highly personal nature of the entire questionnaire. These questions go directly to an individual's family relationship and his rearing. There probably is no more private a relationship, excepting marriage, which the Constitution safeguards than that between parent and child. This Court can look upon any invasion of that relationship as a direct violation of one's Constitutional right to privacy.

The fact that the students are juveniles does not in any way invalidate their right to assert their Constitutional right to privacy. In a "freedom of speech" case involving the wearing of black arm bands protesting the Viet Nam War by students, the Supreme Court, in Tinker v. The Des Moines School District, 393 U.S. 503, at page 511, 89 S.Ct. 733, at page 739, 21 L.Ed. 2d 731 (1968), said:

"School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State."

This Court would add that the right to privacy is on an equal or possibly more elevated pedestal than some other individual Constitutional rights and should be treated with as much deference as free speech. The United States Court of Appeals for the Third Circuit held in Stull v. The School Board of Western Beaver Junior-Senior High School, 459 F.2d 339 (1972), in reversing the District Court, that high school dress codes governing the length of hair in the absence of any evidence of disruption or of a health hazard or of an affect on aca-

demic accomplishment was violative of due process. In another case involving hair length, the United States District Court for the Northern District of Illinois stated in Miller v. Gillis, 315 F. Supp. 94 (1969):

"Students are persons under the Constitution; they have the same rights and enjoy the same privileges as adults. Children are not second class citizens. Protections of the Constitution are available to the newborn infant as to the most responsible and venerable adult in the nation."

As this Court ascertains from the above authority that children who are students are entitled to exercise their Constitutional rights, the question then arises whether parents, as guardians of the children, can waive their children's Constitutional rights. In the case at Bar, the children are never given the opportunity to consent to invasion of their privacy; only the opportunity to refuse to consent by returning a blank questionnaire. Whether this procedure is Constitutional is questionable, but the Court does not have to face that issue because the facts presented show that the parents could not have been properly informed about the CPI Program and as a result could not have given informed consent for their children to take the CPI test.

█ Before dwelling on the question of "informed consent", it should be noted that the case before the Court is a civil case. The Supreme Court has indicated that in civil cases as well as criminal cases the Court should indulge in every reasonable presumption against waiver of procedural due process and an individual's Constitutional rights. See Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1971); Ohio Bell Telephone Co. v. The Public Utilities Comm., 301 U.S. 292, 307, 57 S.Ct. 724, 81 L.Ed. 1093 (1936); and Aetna Insurance Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1936). The standards stated in Brady v. U. S., *supra*, are applicable in this case, as the Su-

preme Court stated at 748 of 397 U.S., at 1469 of 90 S.Ct.:

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent and done with sufficient awareness of the relevant circumstances and likely consequences."

█ The facts as stated show that the letters to the parents were "selling devices" aimed at gaining consent without giving negative information that would make the parents completely aware of "the relevant circumstances and likely consequences" of the Program. Mr. Streit, the man who conceived the CPI Program, admitted that the letter to the parents gave only one side of the test picture. There were no statements to the parents concerning the self-fulfilling prophecy, scapegoating of those children who opted not to participate or the ultimate use of the data as it would effect their children and law authorities who might find it necessary to use that information to learn more about the drug situation in the local community.

The Law does not abound with cases or expert treatises on the problem of personality testing and confidentiality, and the problems of informed consent. However, in a recent Federal Bar Journal article by Charles W. Sheerer and Ronald A. Roston, on "Some Legal and Psychological Concerns About Personality Testing in the Public Schools", 3 Fed.Bar Journal 111 (1971), there is some insight into the problem of scientific testing and the American parent. They stated at 114–115:

"The average American parent has a great and naive faith in 'scientifically' constructed tests. This faith is reinforced by the unconscious desire of the more insecure parents to avoid involvement and to depend on 'professionals' to make the difficult decisions in the education and maturation of their children . . .

"In all probability, he is not clear regarding the qualifications of the

school 'psychologist' who is likely to hold a master's degree in school psychology, not from the psychology department of a college or university, but from an education school or department. Chances are great he has not had significant supervision in a hospital, or outpatient clinic, or from a clinical psychologist or psychiatrist. He is likely to be considered 'untrained' by the persons that parents have in mind when they 'picture' a psychologist . . . Informed consent for personality testing should be comparable to the informed consent ideally obtained by a physician prior to the performance of surgery . . ."

This Court feels that however good may be the intent and motive of the Defendant, the presentation of the CPI Program to the student and the students' parents is far from candid, and any attempt at informed consent does not reach the level that this Court would consider adequate as in the "consent ideally obtained by a physician prior to the performance of surgery". The parents are not aware of the consequences and there is no substitute for candor and honesty in fact, particularly by the school board who, as the ultimate decision maker as far as the education of our children is concerned, should give our citizenry a more forthright approach. The attempt to make the letter requesting consent similar to a promotional inducement to buy, lacks the necessary substance to give a parent the opportunity to give knowing, intelligent and aware consent.

The actual testing of the students and the results gained are suspect. All that the Program does state is that it will identify patterns similar to marijuana, LSD, barbiturate or amphetamine users. There is no reference to the use of drugs and there are no statements as to what constitutes abuse. The study nowhere defines what is a potential drug abuser and is vague in the relationship of its background analysis to the intended results.

There is a statement concerning the confidentiality of the test during its administration and during the immediate evaluation period that is comprehensive and well explained, but the credibility of the confidentiality of this Program breaks down when the potential drug abusers are reported to the school superintendent. The school will then attempt remediation by the use of teachers, guidance counselors and others, who have had little training in the area of psychological therapy in either individual or group therapy sessions. The ultimate use of this information, although possibly gained with a great deal of scientific success, is the most serious problem that faces the Court. How many children would be labeled as potential drug abusers who in actuality are not, and would be subjected to the problem of group therapy sessions conducted by inexperienced individuals?

Strict confidentiality is not maintained after evaluation and there are many opportunities for a child to suffer, insurmountable harm from a labeling such as "drug abuser" at an age when the cruelty of other children is at an extreme. The seriousness of this problem is illustrated by the fact that if one child is so harmed and would be temporarily or permanently damaged by the label of "drug abuser" is this Program worth the effort to identify other actual "drug abusers".

When a program talks about labeling someone as a particular type and such a label could remain with him for the remainder of his life, the margin of error must be almost nil. The preliminary statistics and other evidence indicate there will be errors in identification. The Court recognizes that the Supreme Court has spoken and many Law Review authorities have spoken about a balancing test. What this means is that the Court balances the invasion of privacy against the public need for a program to learn and possibly prevent drug abuse in a society which has become highly aware of the dangers and effects of drug abuse. If the Court finds the public

need so great and the invasion minimal, then it could sanction the Program in favor of public need. The Supreme Court in Barenblatt v. U. S., 360 U.S. 109, at 126, 79 S.Ct. 1081, at 1093, 3 L. Ed.2d 1115 (1959) stated:

"Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." See also Konigsberg v. California State Bar Association, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 810 (1957); and 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).

The Court, in balancing the right of an individual to privacy and the right of the Government to invade that privacy for the sake of public interest, strikes the balance in favor of the individual in the circumstances shown in this case. In short, the reasons for this are that the test itself and the surrounding results of that test are not sufficiently presented to both the child and the parents, as well as the Court, as to its authenticity and credibility in fighting the drug problem in this country. There is too much of a chance that the wrong people for the wrong reasons will be singled out and counselled in the wrong manner.

■ The Plaintiff also contends that other Constitutional rights will be violated if the Defendants are allowed to proceed with the CPI Program. There is no other Constitutional right that this Program would violate besides privacy. The protection against self-incrimination violation may be moot because of the new Pennsylvania Law which attempts to prevent the use of information, obtained confidentially from students, from being used against them in legal proceedings without consent. (24 P.S. § 13–1319)

The evidence presents no violation of the Constitutional right of the student to speak or assemble. The Court recognizes, however, that young people at the junior high school level are ostracized for unpopular views by their peers but no school authority is preventing the students from speaking or assembling. Although there may be a chilling effect or a step in the direction toward the prevention of free speech and assembly, this Court feels that there is no violation of Constitutional rights in this particular fact situation.

The Defendant maintains that the Legislature has vested the school board with discretionary power to act, that is, to test its students, and the burden placed on the Plaintiffs to show that this power is being abused is extremely heavy. Lamb v. Redding, 234 Pa. 481, 83 A. 362 (1912); Robb v. Stone, 296 Pa. 482, 146 A. 91 (1929); and Ritzman v. Coal Township School Directors, 317 Pa. 271, 272, 176 A. 447 (1935). However, as the facts presented in this case, vis-a-vis, a violation of one's Constitutional rights, so overwhelmingly carries the burden there is no question that the school board has overstepped its discretionary authority.

The CPI Program attempts to determine relative to today's problem of drug use and abuse what steps can be taken to prevent students from becoming drug abusers; and if such a program as presented here could be used to identify those who are potential drug abusers. Unfortunately, this Program does not meet the necessary Constitutional and procedural requirements. Setting precedents as to invasion of Constitutional rights without informed consent must be examined very closely and only employed when the balance weighs so heavily in favor of the public need. As the Program now stands the individual loses more than society can gain in its fight against drugs. The Court will enjoin this Program as it fails to meet Constitutional standards.

III. CONCLUSIONS OF LAW

1. This action is brought to redress the deprivation by Defendants, under color of state law, of the rights, privileges and immunities secured to Plain-

tiffs by Article I, Section 9, Clause 3 and the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution. The Court has jurisdiction of the action pursuant to 28 U.S.C. § 1343; 28 U.S.C. § 1331.

2. The CPI Program will violate the Plaintiffs' right to privacy inherent in the penumbras of the Bill of Rights of the United States Constitution.

3. Under the CPI Program, Defendants would unlawfully and without authority attempt to exercise the exclusive privileges of parents, extending into areas beyond matters of conduct and discipline, in excess of their power and contrary to law.

4. The CPI Program will be administered without the knowing, intelligent, voluntary and aware consent of parents or students.

5. Defendants, their agents, servants and employers and all persons acting in concert with them are permanently enjoined and restrained from implementing or in any other way proceeding with the CPI Program and from expending any further county or school district revenues on the CPI Program.