**C.N., individually and as Guardian Ad Litem of J.N., et al.,**

v.

**RIDGEWOOD BOARD OF EDUCATION, et al.**

**No. CIV. A. 00–1072(NHP).**

United States District Court, D. New Jersey.

Feb. 15, 2001.

F. Michael Daily, Jr., Quinlan Dunne & Daily, Merchantville, NJ, for Plaintiffs C.N., L.M., and M.E.

David B. Rubin, Metuchen, NJ, for Defendants Ridgewood Board of Education, Frederick J. Stokley, Joyce Snider, Ronald Verdicchio, Robert Weakley, John Mucciolo, Anthony Bencivenga, and Sheila Brogan.

## OPINION

POLITAN, District Judge.

This matter comes before the Court on the plaintiffs' motion for a preliminary injunction and the defendants' motion for summary judgment. The Court heard oral argument on September 18, 2000. For the reasons explained below, the plaintiffs' motion for a preliminary injunction is **DENIED**, and the defendants' motion for summary judgment is **GRANTED**. This case is now **CLOSED**.

## BACKGROUND

It is said that no good deed goes unpunished, or, at least in this case, unlitigated. The plaintiffs in this action, all residents of the Village of Ridgewood, are the parents of three minor girls who attend Ridgewood public schools. C.N. is the mother of plaintiff J.N., age 15; L.M. is the mother of plaintiff V.M., age 12; and M.E. is the mother of plaintiff J.E., age 17.[1] At the time the events surrounding this action occurred, J.N. and J.E. were students at Ridgewood High School and V.M. was a student at the Benjamin Franklin Middle School. Defendants are the Ridgewood Board of Education and several school administrators, including Frederick J. Stokley, Superintendent of schools; Joyce Snider, Assistant Superintendent; Ronald Verdicchio, member of the central administration; Robert Weakley, Director of Human Resources; John Mucciolo, Ridgewood High School Principal; Anthony Bencivenga, Benjamin Franklin Middle School Principal; and Sheila Brogan, President of the Board of Education.

In September 1998, an organization called the Human Resources Coordinating Council ("HRCC") in Ridgewood, which is comprised of public and private social service agencies, assembled a group of community members whose purpose was to assess the needs and interests of Ridgewood's youth. The group concluded that it was necessary for Ridgewood to survey the student population to gain insight into the needs, attitudes, and behavior patterns of the town's youth.[2] The group met with public organizations and private citizens throughout 1999 and elicited comment regarding the survey. The HRCC created a "Vision Team" to supervise the project, which included thirty persons from every sector of the community, including school officials and one student. Prior to the

---

1. For purposes of convenience, the Court will refer to the plaintiffs collectively as "plaintiffs."

2. Defendants offer that although the idea of a survey arose before the infamous Columbine High School shootings, that tragic event nonetheless "strengthened the community's resolve" to understand their children and help any disaffected or at-risk youth.

culmination of the 1998–99 school year, the Superintendent, Frederick J. Stokley, notified all parents in May 1999 that the survey would be administered in the fall of 1999, and stated the reasons behind the survey. On September 1, 1999, Superintendent Stokley again notified all parents of the survey and advised that the survey was voluntary and anonymous.

The survey itself is fairly extensive but apparently was to be filled out anonymously. There is no space for a student's name or a code, and students were instructed not to place their names or make any distinguishing marks on the paper.[3] The survey, produced by the Search Institute of Minneapolis, Minnesota, consisted of 156 questions. Students answered each question by using a pencil to fill the circle which corresponded to the appropriate answer, such as "Strongly Agree," "Agree," "Not Sure," "Disagree," or "Strongly Disagree." Some of these questions included the following:

40. I get along well with my parents.

43. If I break one of my parent's rules, I usually get punished.

45. It is against my values to have sex while I am a teenager.

Other questions asked the students whether they had, in the past twelve months, engaged in certain activities. A student responded to these questions by similarly filling a circle corresponding to the appropriate answer, such as "Never," "Once," "Twice," "3–4 Times," or "5 or More Times." These questions included some of the following:

56. Stolen something from a store.

57. Gotten into trouble with the police.

58. Hit or beat up someone.

59. Damaged property just for fun (such as breaking windows, scratching a car, putting paint on walls, etc.).

Still other questions asked students how many times over the last two weeks they had imbibed alcohol, specific types of drugs, or had driven a vehicle after drinking alcohol. Further areas covered by the survey included violent and criminal behavior and sexual activity and proclivities.

The survey was administered to students at the Benjamin Franklin Middle School on October 13, 1999, and to students at the Ridgewood High School on November 2, 1999. On March 6, 2000, plaintiffs brought this action pursuant to 42 U.S.C. § 1983, alleging a deprivation of rights secured by the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, the Family Educational Records Privacy Act, 20 U.S.C. § 1232g ("FERPA"), and the Protection of Pupils Rights Amendment, 20 U.S.C. § 1232h ("PPRA"). The plaintiffs argue that the survey was highly invasive of the students' privacy and that the Board did not properly and adequately notify the parents and the students that the survey was voluntary and anonymous. Specifically, plaintiffs complain that the Board did not obtain written consent from the parent and/or parents of each student.

Additionally, plaintiffs allege that prior to the administration of the survey the defendants failed to notify parents as to how and when the survey would be administered, how students could elect not to participate, how nonparticipating students would be accommodated, whether parental consent would be required before their child could take the survey, whether parents had a right to object to their child

---

**3.** The front cover of the survey clearly instructs students that the "answers on this questionnaire will be kept strictly confidential. DO NOT put your name on this form. It has no code numbers, so no one will be able to find out how you or anyone else answered.... Therefore, no one will be able to connect your answers with your name."

taking the survey, how parents could object to their child taking the survey, and whether certain questions would be subject to a Fifth Amendment right against self-incrimination.

## DISCUSSION

Plaintiffs have filed for preliminary injunctive relief, while defendants have moved for summary judgment. For the following reasons, the Court will grant defendants' motion for summary judgment. Because summary judgment is appropriate, plaintiffs' preliminary injunction request is denied.

### I. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, for which that party will bear the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See id.* at 323, 106 S.Ct. 2548. Whether a fact is material is determined by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility .... against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983) (citing *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972)).

Further, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. An issue is "material" only if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To defeat "a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor." *Groman v. Tp. of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995). Accordingly, the party opposing summary judgment may not merely restate the allegations of its pleadings. *See Farmer v. Carlson*, 685 F.Supp. 1335, 1339 (M.D.Pa.1988). Moreover, a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. If the record, as a whole, cannot "lead a rational trier of fact to find for the nonmoving party, there is no 'genuine is-

sue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## II. § *1983 Action Against the Board of Education*

The touchstone of a Section 1983 action against a local government body is an allegation that official policy or custom is responsible for the deprivation of the plaintiff's constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). There must exist "affirmative decisions of individual policymaking officials." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir.1999) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

As defendants argue, plaintiffs cannot maintain a § 1983 action against the Ridgewood Board of Education because the allegations lodged against the Board are not a reflection of Board policy, but rather a violation of Board policy. The Court is inclined to agree. The gravamen of the Complaint is that defendants violated the PPRA, the FERPA, and the First, Fourth, Fifth, and Fourteenth Amendments by failing to provide parents and students with proper notice that the survey was voluntary, by implementing a mandatory survey, and by failing to obtain the written consent of the parents.

The evidence, however, shows the parents were given ample notice that the survey was voluntary and anonymous. Superintendent Stokley sent a letter to the parents on September 1, 1999, specifically emphasizing in underlined print that the survey was to be *"voluntary"* and *"anonymous."* The first sentence in the directions for administering the survey, which were given to all teachers, reads "Students should be informed that the survey is anonymous and voluntary." The directions give further guidance in the event a student elects not to fill out the survey. Notwithstanding any subjective belief on the part of the students that the survey was mandatory, all of the objective indicia point to the administration of a voluntary and anonymous survey. Therefore, the official policy of the Board was that the survey be administered voluntarily and anonymously.

Consequently, even assuming employees of the Board failed to follow this directive, their actions cannot be characterized as carrying out the policy of the Board. Rather, if we were to assume the teachers who implemented the survey actually administered the survey in a mandatory fashion, this is instead a *violation* of the Board's policy. Accordingly, based on *Monell*, plaintiffs cannot maintain a § 1983 cause of action against the Board of Education.[4]

## III. *Qualified Immunity*

The individual defendants seek cover under the doctrine of qualified immunity. The issue of qualified immunity should be decided as early in the litigation as possible so as to relieve government officials of the burden of broad-reaching discovery. *See Crawford–El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d

---

4. And, as demonstrated below, written parental consent was not necessary.

277 (1991). Municipal officers enjoy qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To defeat the qualified immunity defense of a municipal officer sued in his individual capacity, a plaintiff must demonstrate that " 'the particular actions taken by defendant were impermissible under law established at that time.' " *W.B. v. Matula*, 67 F.3d 484, 500 (3d Cir.1995) (quoting *P.C v. McLaughlin*, 913 F.2d 1033, 1040 (2d Cir. 1990)).

■ A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). By contrast, if "the law is not established clearly when an official acts, he is entitled to qualified immunity because he 'could not reasonably be expected to anticipate subsequent legal developments.' " *Matula*, 67 F.3d at 499 (quoting *In re City of Philadelphia*, 49 F.3d 945, 961 (3d Cir.1995)). On the other hand, the "clearly established" standard does not require " 'precise factual correspondence between relevant precedents and the conduct at issue.' " *In re City of Philadelphia*, 49 F.3d 945, 970 (3d Cir.1995) (citation omitted). An official will not be liable for allegedly unlawful conduct so long as his actions are objectively reasonable under current federal law. *See Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir.2000) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ Defendants persuasively argue that the law governing student surveys was not clearly established at the time of the alleged violation. First, the case law demonstrates that at the time the survey was administered, the question of whether the PPRA even applied to this survey was not established clearly.

Courts have held that where no federal funds are used in a program, schoolchildren cannot challenge the program under the PPRA. *See Altman v. Bedford Cent. Sch. Dist.*, 45 F.Supp.2d 368, 390 (S.D.N.Y. 1999); *Herbert v. Reinstein*, 976 F.Supp. 331, 339 (E.D.Pa.1997). In this case, there is evidence that the survey was actually funded solely by the township. In addition, the Department of Education has yet to promulgate regulations which might explain when a survey falls under the tentacles of the PPRA.

Further, plaintiffs' Complaint asserts that defendants did not first obtain the written consent of the parents before administering the survey. But the PPRA calls for written parental consent only before any minor pupil can be "required" to submit to a survey. *See* 20 U.S.C. § 1232h(b). Where the survey is not "required," i.e., where it is voluntary, no written parental consent is necessary, and the PPRA is silent regarding the proper method by which students and parents are to be notified that student participation is not "required." [5] No rules or regulations have been promulgated which prescribe the appropriate manner in which students and parents are to be informed that the survey is voluntary. The case law on this point is similarly sparse. Therefore, it is this Court's opinion that the issue of whether the Board was required to comply with the PPRA was not clearly established at the

---

**5.** A Bill was recently introduced in the New Jersey State Assembly (Assembly Bill No. 2351) which would require written parental consent for the type of survey used in this case, regardless of the mandatory or voluntary nature of the survey.

time. Likewise, the law concerning the proper method of informing students and parents of the voluntary nature of the survey was not established clearly.

Furthermore, the law regarding the proper administration of a survey was not clearly established at the time the defendants administered the survey in question. In sum, at the time of the alleged violations the "contours of current law" pertaining to the PPRA as it relates to the administration of student surveys would not put a reasonable defendant on notice that his conduct would violate the PPRA. Accordingly, the individual defendants are entitled to qualified immunity as to the PPRA claims.[6]

■ Turning to the plaintiffs' constitutional claims, a review of the case law reveals that the defendants' actions were objectively reasonable under federal law. There is no indication now or in October of 1999 that a voluntary and anonymous survey which is used to obtain data in the aggregate (rather than personal information on particular individuals) would violate plaintiffs' First Amendment rights to refrain from speaking; their Fourth Amendment rights regarding intrusion into a person's household; the Fifth and Fourteenth

Amendment rights of parents to raise their children; their Fourth, Fifth and Fourteenth Amendment rights to privacy; or their Fifth Amendment rights against self-incrimination.

The cases cited by plaintiffs supposedly supporting their position are easily distinguishable. It would strain logic to conclude that under these circumstances a reasonable public official would know that his or her specific conduct violated plaintiffs' constitutional rights. Accordingly, the individual defendants are entitled to qualified immunity as to the constitutional claims. Summary judgment is therefore appropriate.

## IV. *The PPRA and FERPA Claims*

■ Even assuming the Board and individual defendants were not immune to suit, plaintiffs' claims nevertheless fail on the merits. Although one may sue under 42 U.S.C. § 1983 to vindicate violations of the Constitution or federal statutes, plaintiffs cannot establish that the PPRA or FERPA even apply to this situation. Moreover, plaintiffs have not proffered a scintilla of evidence showing the defendants violated the PPRA or FERPA.[7]

6. As explained below, the Court need not address qualified immunity as to the FERPA claim because that law has no application in this case.

7. Plaintiffs concede that the question of whether the PPRA or the FERPA provide a private right of action is irrelevant because 42 U.S.C. § 1983 may be used to enforce such rights. Nonetheless, it must be noted that indeed neither the PPRA nor the FERPA provide a private right of action. *See Altman v. Bedford Cent. Sch. Dist.*, 45 F.Supp.2d 368, 390 (S.D.N.Y.1999) (no implied private right of action in PPRA); *Herbert v. Reinstein*, 976 F.Supp. 331, 339 (E.D.Pa.1997) (same); *Tarka v. Franklin*, 891 F.2d 102, 104 (5th Cir. 1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 940 (1990) (no implied

private right of action under FERPA); *Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 33 (2d Cir.1986) (same); *Girardier v. Webster College,* 563 F.2d 1267, 1276–77 (8th Cir. 1977) (same); *Hartfield v. East Grand Rapids Public Schools,* 960 F.Supp. 1259, 1264 (W.D.Mich.1997) (same); *Doe v. Knox County Bd. Of Educ.*, 918 F.Supp. 181, 184 (E.D.Ky. 1996) (same); *Odom v. Columbia Univ.,* 906 F.Supp. 188, 195 (S.D.N.Y.1995) (same); *Belanger v. Nashua, New Hampshire, Sch. Dist.,* 856 F.Supp. 40, 43 n. 4 (D.N.H.1994) (same); *Rothman v. Emory Univ.,* 828 F.Supp. 537, 542 (N.D.Ill.1993) (same); *Norris by Norris v. Bd. of Educ. Of Greenwood Cmty. Sch. Corp.,* 797 F.Supp. 1452, 1462 (S.D.Ind.1992) (same); *Norwood v. Slammons,* 788 F.Supp. 1020, 1026 (W.D.Ark.1991) (same); *Smith v. Duquesne Univ.,* 612 F.Supp. 72, 80 (W.D.Pa.

■ Section 1983 provides a federal cause of action in cases where an individual's constitutional rights are violated by another acting under color of state law. Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. The statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Alexander v. Whitman*, 114 F.3d 1392, 1400 (3d Cir.), *cert. denied*, 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Therefore, in order to establish a claim under Section 1983, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995) (quoting *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir.1993)).

Plaintiffs cannot establish either that the PPRA applies to this case or, assuming it does, that a violation of the PPRA occurred. The PPRA prohibits requiring students to submit to a survey concerning certain personal issues without prior written consent of the parent.[8] As the statute provides, no student shall be "required" to submit to a survey as part of "any applicable program."

Plaintiffs cannot establish that the survey was administered as part of an "applicable program." As defined by the General Education Provisions Act, 20 U.S.C. § 1221 *et seq.* ("GEPA"), an "applicable program" is the following:

[A]ny program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law. The term includes each program for

---

1985), *aff'd*, 787 F.2d 583 (3d Cir.1986) (same).

8. The PPRA provides that:
No student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning—
(1) political affiliations;
(2) mental and psychological problems potentially embarrassing to the student or his family;
(3) sex behavior and attitudes;
(4) illegal, anti-social, self-incriminating and demeaning behavior;
(5) critical appraisals of other individuals with whom respondents have close family relationships;
(6) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers; or
(7) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program),
without the prior consent of the student (if the student is an adult or emancipated minor), or in the case of an unemancipated minor, without the prior written consent of the parent.
20 U.S.C. § 1232h(b). The survey in this case clearly touches upon several of the issues recited in the statute.

which the Secretary or the Department has administrative responsibility under the Department of Education Organization Act [20 U.S.C. § 3401 *et seq.*] or under Federal law effective after May 4, 1980. 20 U.S.C. § 1221(c)(1). "The text of the statute and the regulations implementing it indicate that Section 1232h was meant to apply only to programs administered by the Secretary of Education." *Herbert v. Reinstein*, 976 F.Supp. 331, 340 (E.D.Pa. 1997).

█ As the defendants correctly point out, the statute and the regulations promulgated by the Department of Education do not define what administrative responsibility the Secretary or the Department must have to trigger the PPRA. *See* 20 U.S.C. § 1221(c)(1); 34 C.F.R. § 98.1. Although the Department of Education published a notice of proposed rules on August 28, 1995, those rules were never formally adopted.[9] In defining an "applicable program," courts have pointed to this unadopted rule and held that where no federal funds are used in a program, schoolchildren cannot challenge the program under the PPRA. *See Altman v. Bedford Cent. Sch. Dist.*, 45 F.Supp.2d 368, 390 (S.D.N.Y. 1999); *Herbert*, 976 F.Supp. at 339. In this case there is no evidence that the survey was administered using federal funds. In fact, it appears that the survey was funded solely by the township. As a result, the plaintiffs have no claim under the PPRA.

Neither has it been established that the students were "required" to answer the survey questions. To the contrary, the evidence demonstrates that the survey was completely voluntary. Whether some stu-dents may have subjectively believed the survey to be mandatory is of no moment-the objective indicia point to the implementation of a voluntary survey. In a September 1, 1999, letter to the parents, Superintendent Stokley specifically cautioned that the survey was "*voluntary* and *anonymous.*" In addition, the first sentence in the teachers' instructions for administering the survey, which were given to all teachers, reads "Students should be informed that the survey is anonymous and voluntary." The directions give further guidance in the event a student elects not to fill out the survey. Clearly, then, the survey was intended to be voluntary. As such, the PPRA is not applicable and written parental consent was not necessary.

█ Plaintiffs stand on even weaker ground with respect to their § 1983 claims under FERPA. The provisions of FERPA do not touch upon the survey which is at issue in this case. Rather, FERPA governs the accessibility and privacy of student education records at educational institutions. FERPA was enacted to ensure access to educational records for parents and students while protecting the privacy of such records. *See Student Press Law Center v. Alexander*, 778 F.Supp. 1227 (D.D.C.1991). The statute merely provides that the Secretary of Education is solely responsible for enforcing its provisions and protections. *See* 20 U.S.C. § 1232g(f). The only mention of surveys in the FERPA is found at § 1232g(c), which is entitled "Surveys or data-gathering activities; regulations." This section, however, does not contain substantive provisions regarding surveys, but merely prescribes a time frame by which the Secre-

---

9. The proposed rule suggested that § 1232h(b) be interpreted as applicable to any survey administered by a school district that "[u]ses funds, received from the Department, to develop or implement the survey." Proposed § 98.20(a), 60 *Fed.Reg.* 44696, 44700 (1995).

tary of Education shall adopt appropriate regulations.

Moreover, FERPA is violated only when there is a "policy or practice" which prevents the inspection and review of a student's education records, *see* 20 U.S.C. § 1232g(a)(1); *Weixel v. Bd. of Educ.*, 2000 WL 1100395, at *7 (S.D.N.Y. Aug.7, 2000), or by which student education information is disclosed without parental or student authorization. *See* 20 U.S.C. § 1232g(b)(1). *See also Weixel*, 2000 WL 1100395 at *7; *Schuler v. Board of Educ.*, 2000 WL 134346, at *9–10 (E.D.N.Y. Feb.1, 2000); *Jensen v. Reeves*, 45 F.Supp.2d 1265, 1276 (D.Utah 1999) (holding that FERPA addresses systematic, not individual, violations of student privacy). Here, there is no "policy or practice" of the Board which prevents the inspection and review of a student's education records or which allows student education information to be disclosed without parental or student authorization. Indeed, it appears that the FERPA is inapplicable in this case. Accordingly, summary judgment dismissing the FERPA claim is appropriate.

## V. *Constitutional Claims*

Plaintiffs' claims based on the First, Fourth, Fifth and Fourteenth Amendments of the Constitution are similarly without merit. The case law indicates that the First, Fourth, Fifth and Fourteenth Amendments are not offended by the voluntary and anonymous survey used in this case. Regarding the First Amendment claim, "[t]he freedom of speech protected by the First Amendment, though not absolute, includes both the right to speak freely and the right to refrain from speaking at all." *Steirer by Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 993 (3d Cir.1993) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)).

Plaintiffs contend their First Amendment claim falls under the category of "compelled disclosure" cases. *See* Leora Harpaz, *Justice Jackson's Flag Salute Legacy: The Supreme Court Struggles to Protect Intellectual Individualism*, 64 TEX. L.REV. 817, 818 (1986) (distinguishing "[t]wo distinct kinds of liberty interest [that] support the right to refrain from expressive activity[,] . . . an interest in not being forced to reveal information about personal beliefs or associations . . . [and] an interest in not being forced to belong to any organization or to make any statements when [individuals] would rather be silent or express different views").

Plaintiffs' attempt to analogize this case to the so-called "compelled disclosure" cases is misplaced. This is not a "compelled disclosure" case because, simply put, the Board of Education compelled nothing. The cases plaintiffs principally rely upon are inapplicable and involve situations where a prospective employee is *required* to either fill out a questionnaire or authorize release of private information as a *condition* to employment. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105 (3d Cir. 1987); *Denius v. Dunlap*, 209 F.3d 944 (7th Cir.2000). In this case, however, the survey was voluntary and not administered as a condition to gaining employment or any other privilege or right. No adverse repercussions would occur if a student decided not to answer the survey. Moreover, here the identities of the students filling out the survey were completely confidential, whereas in *Fraternal Order of Police,* the administrators of the questionnaire would know how each applicant answered each question. Likewise, the employer in *Denius,* through its required condition, would gain access to the

plaintiff's private information and identity.[10]

This case is also quite different from *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), where the Supreme Court held that a public school teacher need not reveal all organizations to which that teacher has belonged for fear of community hostility or loss of employment. The disclosure in *Shelton* was a mandatory condition to gaining employment. Ostensibly, the employer would review each applicant's information and possibly use that information in making an employment decision. In this case, however, the Board of Education attempted to collect personal information in an anonymous fashion which would be used to analyze the resulting data in the aggregate. The identity of each individual student, and each student's answers to the survey, could not be discovered. Counsel for the Board has also represented that the surveys will be destroyed after the final results are completed.

Plaintiffs' claim for "unreasonable intrusion into the households" of the respective plaintiffs in violation of the Fourth and Fourteenth Amendments suffers from similar infirmities. *See* Complaint at ¶ 36, Second Count. As explained above, the survey was voluntary and anonymous in nature and therefore no intrusion occurred. Plaintiffs cite no case law or facts which support this cause of action. For the same reasons, their claim that the defendants "invaded and impaired [their]

rights to privacy under the Fourth, Fifth, and Fourteenth Amendments" must also be dismissed. *See* Complaint at ¶ 42, Fourth Count.

The claim alleging violation of plaintiffs' Fifth and Fourteenth Amendment substantive due process rights to direct the upbringing of their children also fails on the merits. *See* Complaint at ¶ 39, Third Count. It is without question that parents possess a fundamental due process right to raise their children without undue state interference. *See Gruenke,* 225 F.3d at 307. In this case, however, the defendants' actions do not rise to the level of a constitutional violation, and in no way infringed upon plaintiffs' rights to raise their children as they see fit.

The majority of cases concerning a parent's fundamental right to make decisions concerning the care, custody, and control of children involve the "injection" of the state into the private, familial realm. *See Gruenke,* 225 F.3d at 309 (discussing cases involving the "injection of the state into the process of raising children."). As the Third Circuit succinctly concluded in *Gruenke,* the typical parental intrusion case "involve[s] a situation in which the state has attempted by statute or by a court's procedural requirements to eliminate a parent's role in the custody or nurture of the child." *Id.*

Here, there has been no injection by the defendants into the private realm of the family.[11] The parents were provided with

---

10. In *Krebs v. Rutgers,* 797 F.Supp. 1246 (D.N.J.1992), a case which plaintiffs also rely upon and which is inapposite to this case, the Court enjoined a university from distributing class rosters that listed students by name and full social security number. Also distinguishable from our case is *Murray v. Pittsburgh Bd. of Educ.,* 759 F.Supp. 1178 (W.D.Pa.1991), where the district court denied a teacher's motion to enjoin a board of education from

requiring the teacher to submit to a psychiatric examination as a result of the teacher's pattern of absences and other unexplainable behavior.

11. Mr. Daily's insinuation that the conduct of the defendants is somehow analogous to the practices of Nazi Germany and the Stalinist Soviet Union is an utterly preposterous and astonishing assertion. *See* Reply Brief of

ample notice of the administration of the survey. Plaintiffs were also informed that the survey was voluntary and anonymous. Based on these facts, defendants have in no way impinged on the plaintiffs' rights to raise their children in a manner in which they choose.[12] Consequently, the parental rights claim must be dismissed.

The claim arising under the Fifth and Fourteenth Amendments with respect to the right against self-incrimination is easily resolved. *See* Complaint at ¶ 45, Fifth Count. Plaintiff C.N. complains that a handwriting expert could identify her child's survey, thereby exposing her child to potential criminal prosecution. Such a scenario is difficult to imagine, considering the students were instructed not to write on the survey and answered the survey by merely filling a small circle with the very familiar No. 2 pencil. Counsel for defendants represented at oral argument that the company which created the survey and collects and assesses the data likely destroys each survey upon completion of the survey results. In any event, counsel for defendants also stated that the Board would destroy the surveys once the final results are completed.

Moreover, the anonymous nature of the survey makes it improbable, if not impossible, that anyone, let alone law enforcement officials, could ascertain the identity of any student who filled out the survey. In fact, this argument was rejected when the Third Circuit revisited *Fraternal Order of Police* after a remand and second appeal. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 859 F.2d 276, 282–83 (3d Cir.1988). That court held that requiring police officers to answer a questionnaire seeking medical information, information concerning police officer's behavior, and financial information of the officer and his or her family did not violate the privilege against self-incrimination because the officers were not compelled to fill out the application. *See Fraternal Order of Police,* 859 F.2d at 282–83. Accordingly, the claim based on self-incrimination under the Fifth and Fourteenth Amendments is also dismissed.

## CONCLUSION

For the foregoing reasons, the motion of the plaintiffs for a preliminary injunction is **DENIED**. The motion of the defendants for summary judgment is **GRANTED**. Accordingly, the plaintiffs' Complaint is **DISMISSED WITH PREJUDICE** and this case is **CLOSED**.

---

Plaintiffs In Support of Motion for Preliminary Injunction at 7, footnote 2. Such irresponsible suggestions have no place in a court of law.

**12.** This case is distinguishable from *Merriken v. Cressman,* 364 F.Supp. 913, 921 (E.D.Pa. 1973), where the district court held unconstitutional a high school's questionnaire aimed at identifying potential drug users. Far from the circumstances surrounding this case, the program in *Merriken* was initially designed as mandatory and sought to actually identify potential drug users, report the potential drug-using student to the school superintendent, and then subject the student to an intervention. The questionnaire also asked students to identify other students in the class who make unusual or odd remarks, get into fights with other students, or behave in other inappropriate ways. In addition, the program was directed at minors whose parents had been deceived as to the intent of the program.